grant of it in force when the United States patent was granted, namely, at the end of five years from the 15th of May, 1873, and that the two extensions severally granted in March, 1878, cannot affect the question. The bill in this case was filed July 7th, 1877, and the defendant appeared August 3d, 1877. For the plaintiffs it is contended, that the United States patent must run until the Canada patent expires, under its extensions, namely, until May 15th, 1888.

In the case of Henry v. Providence Tool Co. [Case No. 6.384], in the circuit court for the district of Rhode Island, before Mr. Justice Clifford, in October, 1878, a similar question arose in regard to a United States patent granted in October, 1871, under section 25 of the act of July 8th, 1870 (16 Stat. 201), which is embodied in section 4887 of the Revised Statutes. The United States patent ran, on its face, for 17 years. A patent for the same invention had been granted to the patentee, in Great Britain, in November, 1860, for 14 years, and it was contended that the United States patent expired, by operation of law, when the English patent expired. In reply, it was urged, that the language of the statute extended not only to the term of the foreign patent in force when the United States patent was granted, but also to the term of any prolongation which the patentee might obtain from the foreign government. The patentee, before the English patent expired, applied for its prolongation, to her majesty, in council. Thirteen days after it expired, an order in council was made for the granting of a new patent for 4 years. Such prolongation operated as an extension of the original term, and the 4 years began to run at the moment when the original term expired. But Mr. Justice Clifford held, that congress never intended to extend the term of the United States patent beyond the legal term secured to the foreign patentee when the United States patent was granted; and that no act of a foreign sovereign, nor any act of a foreign legislature, could have the effect to prolong the term of a patent granted here, beyond the term prescribed by the act of congress. Mr. Justice Clifford refers, with force, to the considerations, that, as the statute refers not only to the foreign patent, but, if there be more than one, to the one having the shortest term, it cannot be held to include any subsequent prolongation or extension of the monopoly beyond that vested in the foreign patentee at the time of the granting of the United States patent; that, if congress had intended otherwise, the language would have been different, and words would have been employed to signify that the domestic patent should continue as long as the same invention was protected by the foreign government; and that, under the opposite rule, neither the authorities of the United States, nor inventors, nor the public, would ever be able to know what the patentee acquired under a patent granted by the United States, in a case where the invention

had been previously patented in a foreign country. Another view applicable to the present case is, that, before the Canada extensions were granted, the defendant had put in a plea to the bill, and the plaintiff had set down such plea for argument. There would, therefore, under the plaintiffs' view, be one rule governing this suit, if it were to be determined according to the state of things existing when it was brought, and there would be another rule governing suits brought on the United States patent after the Canada extensions were granted. The plaintiff suggests a distinction between the case of Henry v. Providence Tool Co. [supra] and this case, because in this case the Canada patent did not expire before it was extended, and because an extension in Canada is not a matter of favor. But it is not perceived that these considerations are of sufficient force to cause any other conclusion as to the plain meaning of the statute to be adopted than that arrived at by Mr. Justice Clifford; and I think such conclusion is the proper one applicable to the present case.

It is contended for the plaintiff, that the second claim of the reissue of June, 1877, which is the only claim in question on this motion, is not patented in the Canada patent; and that no one of the three claims of the Canada patent contains the combination of elements which is embraced in the second claim of such reissue. But I think it quite clear that the statement in the Canada patent of the first part of the invention, and the substance of the first claim of that patent, embody the combination and arrangement found in the second claim of the United States reissue. The motion is denied.

[For other cases involving this patent, see Reissner v. Anness, Cases Nos. 11,686–11,688.]

REITER (UNITED STATES v.). See Case No. 16,146.

RELAMPAGO, The (STONE v.). See Case No. 13,486.

## Case No. 11,690.

### The R. E. LEE.

[2 Abb. U. S. 49; 2 Chi. Leg. News, 397; 3 Am. Law T. Rep. U. S. Cts. 168; 5 Am. Law Rev. 181; 2 Leg. Gaz. 298.] 1

District Court, S. D. Mississippi. June Term, 1870.

CARRIERS—LIABILITY FOR BAGGAGE—IN CUSTODY OF PASSENGER.

The liability of a carrier of passengers, as such, for the baggage of a passenger, is limited to such property as is delivered to the care and custody of the carrier, or his agents and servants, during the transportation. It does not extend to articles which the passenger retains in charge. Thus, where jewelry usually worn by two lady passengers upon a steamboat, as a part of their apparel, was left by them in their stateroom in a carpet-bag, with other articles

1 [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission. 5 Am. Law Rev. 181, contains only a partial report.]

of personal use, and was stolen while they were at supper,—*held*, that the steamer was not liable therefor.

[Cited in Gleason v. Goodrich Transp. Co., 32 Wis. 92.]

[This was a libel by George F. King and wife against the owners of The R. E. Lee to recover the value of jewelry lost while on board the vessel.] The cause was submitted upon an agreed statement or facts, the substance of which is stated in the opinion.

HILL, District Judge. This cause is submitted upon the following agreed facts:

The libelants and their daughter took passage on the steamer against which the libel is filed, at New Orleans, for Vicksburg. They paid the usual passage fare, and delivered their trunks, &c., to the baggage master, and retired to the state-rooms assigned them, taking with them a small leather hand-bag, or companion, in which the ladies carried their combs, brushes, and articles of immediate necessity in traveling. In the evening, the ladies made their toilet for tea, leaving in the hand-bag or companion, jewelry usually worn on their persons, as part of their apparel, worth one hundred and five dollars. This companion was hung on a hook, on the side of the state-room. When the ladies left the room they closed the door, and on returning from tea found that during their absence some one had entered the room and abstracted the jewelry. Notice of the theft was immediately given to the officers of the boat, who made inquiries for the property, but did not recover any portion of it. Payment of its value was then demanded of the officers of the boat, but was refused.

Whether or not the boat was liable for the loss under these circumstances, is the only question to be decided. The amount claimed is small, but the question is an important one to travelers and common carriers, and therefore demands serious inquiry.

That the steamer is liable, as a common carrier, for the libelants' ordinary baggage, committed to the care of the officers in charge, is admitted; but that this hand-bag, or companion, with its contents, was committed to their charge, is denied by the respondent, and the facts, as stated, do not show that any actual delivery thereof was made, or intended to be made, but that it was retained by the ladies in their own possession.

The rule in England, and, perhaps, in this country, before the invention of steamboats and railroads, was very strict upon common carriers, and rendered them liable for the loss of the baggage of passengers conveyed by them; one reason given was, that often there was a conspiracy between the coachman and the robber; but under our recent modes of travel, this rule has been very properly modified, and the carriers are only held responsible for such portion of the passenger's baggage as may have been delivered

to them, or to the agent whose business it is to receive and take care of the same. This delivery must be complete. See Blanchard v. Isaacs, 3 Barb. 383; Kent, Comm. 604; Packard v. Getman, 6 Cow. 757. In Tower v. Utica, etc., R. Co., 7 Hill, 47, it was held by Nelson, C. J., that a passenger who retains his overcoat in his seat, cannot recover against the company for its loss. Again, Mr. Story, in his work on Contracts (section 766), holds that in this country, if a passenger does not surrender his baggage to the carrier, but retains it in his own possession, and it is lost, he cannot recover against the carrier therefor. Other authorities might be referred to, but these are sufficient.

I am referred by libelant's proctor to Mississippi R. Co. v. Kennedy [41 Miss. 671] as sustaining the adverse proposition, but that is not a case in point. It is true, it holds that jewelry usually worn as part of personal apparel, does constitute a portion of a traveler's baggage, but in that case the trunk in which the articles were placed was delivered to the baggage master.

I am also referred for the same purpose to the case of Macklin v. New Jersey Steamboat Co., reported in 7 Abb. Pr. (N. S.) 229. This case was decided by the court of common pleas, New York. This was a case in which the passenger was given the key of his state-room, and took his valise with him. The substance of the ruling is, that this was a delivery to the officers of the boat, who, if they did not intend to become liable, should have notified him of the fact. The ruling of the court in that case, from the authorities cited, was based upon the older cases, and is not sustained by reason or the modern cases.

I am also referred to the case of Epps v. Hinds. 5 Cush. 657. This was a suit against an inn-keeper. The guest requested the inn-keeper to send his trunk to his room. The guest placed the money given him by his father to pay his traveling expenses and his tuition at the University at Oxford, to which he was going, in the trunk, and locked it. Some time afterward, the inn-keeper placed in the same room another guest, who, during the night, broke open the trunk, took the money, and left. The inn-keeper was properly held liable, for he had no right, after having assigned the guest to his room, to intrude another into it without his consent. Again, the trunk had been delivered to the inn-keeper, who was only requested to remove it to another room, and, if he was not willing to take the risk, should have notified the guest.

These cases, when properly considered, do not support the claim of the libelants. The baggage for which the carrier is responsible, must be such as can, with propriety, be placed in the baggage room, or must be delivered to the clerk of the boat, or some other officer authorized to receive it, and not such articles as the passenger necessarily

keeps in his possession, such as the hand-bag or companion stated in this case. I am satisfied, from a careful examination of authorities, and the agreed state of facts, that the claim of the libelants in this case cannot be sustained. The libel will, therefore, be dismissed, at the cost of libelants. Libel dismissed.

## Case No. 11,691.

### The R. E. LEE.

[1 Lowell, 36.] [1]

District Court, D. Massachusetts. Sept., 1866.

PRIZE—JOINT CAPTORS—NAVAL SIGNALS.

Six miles is the greatest distance at which the day signals of the navy can be read, under ordinary circumstances. In this case, five miles was taken as signal distance; and the alleged joint captors were decided to have been beyond that distance.

This prize was taken by the gunboat James Adger, off Beaufort Harbor, North Carolina, on the ninth day of November, 1863, at about fifteen minutes past seven o'clock in the morning. Four vessels of the navy were lying in the harbor of Beaufort, and two of them, the Iron Age and Newbern, asserted a title as joint captors. The only question necessary to the decision of their right was, whether they were within signal distance of the James Adger at the time of the capture. The Iron Age made prompt and energetic efforts to get under weigh with her sails, but was foiled for some time by the strength of an adverse tide. As soon as possible she proceeded to sea; but it appeared that she did not reach the bar at the mouth of the harbor until a considerable time, probably more than half an hour, after the capture. Her anchorage was a mile or so above Fort Macon, and a somewhat greater distance above the bar, and near the Newbern. The other two vessels, the Viletta and Badger, were about a mile further off.

R. H. Dana, Jr., Dist. Atty., for the United States.

C. L. Woodbury, for the James Adger.

E. M. Felt, for the Iron Age and Newbern.

LOWELL, District Judge. The first question is, what was signal distance on the day and at the place of this capture. In respect to night signals, I have lately had occasion to regret an apparently hopeless difference of opinion among naval gentlemen of skill and experience. With day signals, however, the case is otherwise. The evidence of the additional witnesses examined in the recent

1 [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

case of The Cornubia [Case No. 3,247], for use in all these cases, is much more nearly alike on this subject than on the other. The question being how far these signals can be seen and read under the most favorable circumstances: Commodore Bayley says about four miles. Captain Jenkins says, they cannot be read with certainty, in his opinion, at greater distances than from five to eight miles. . . . If squarely seen by the observer, with a good glass, their colors may be defined with ease at the lesser of these distances, and probably at the maximum distance named. He afterwards mentions a particular station with which he was familiar, at which the usual distance of signalling varies from four and a half to five miles, and where, he says, they are seldom misunderstood. Captain Sands puts the distance, under the most favorable circumstances, at about six miles; and Lieutenant-Commander Quackenbush, at about five. In the case of The Princess Royal [Id. 11,432], in the Eastern District of Pennsylvania, to which I referred in the decision of The Cornubia [supra], the naval assessors reported that five miles may be considered the maximum distance at which these flags can be seen and read under ordinary circumstances. And in a case in the district court for the Southern district of Florida (The Alice Vivian [Case No. 197]), Judge Fraser, sitting for the judge of the district, who had a disqualifying interest, rejected the claims of two vessels, one of which was supposed to be about eight miles distant, and from which the colors, hoisted by the capturing vessel and the boat boarding the prize, were said to have been distinctly seen. The foundation of this opinion was the evidence of experts, that signal distance by day, is between five and six miles.

The fair result of all these opinions appears to be, that six miles must be considered the greatest distance at which the day signals can be read, under what may be called ordinarily favorable circumstances. But the evidence on both sides, in this case, is quite agreed, that on the morning of the capture of the R. E. Lee the state of the atmosphere was very unfavorable for seeing objects in the direction in which the James Adger and her prize bore from the asserted joint captors. Five miles is a liberal allowance for the purposes of this case, if six miles is a fair average distance.

The judge then examined, in detail, the evidence concerning the distance of the Newbern and the Iron Age from the place of capture, and decided that it was more than five miles, in the case of each of those vessels, and pronounced for the James Adger as sole captor.